**EXHIBIT 6**

BEFORE THE AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| REDONDO MANAGEMENT, LLC<br>Claimant and counterclaim respondent, | §<br>§<br>§ | |
| v. | §<br>§ | AAA CASE NO. 01-18-0000-7850 |
| CLEAR LOAN SOLUTIONS, LLC<br>Respondent and counterclaim claimant | §<br>§<br>§<br>§ | |
| v. | §<br>§ | |
| MARK KOETTING<br>Counterclaim respondent | §<br>§<br>§ | |
| PRAIRIE GATE I, LLC<br>Counterclaim respondent | §<br>§<br>§ | |
| MAINSPRING MANAGEMENT, LLC<br>Counterclaim respondent | §<br>§ | |

CONSOLIDATED WITH

| | | |
|---|---|---|
| GREEN GATE SERVICES, LLC<br>Claimant and counterclaim respondent | §<br>§<br>§ | |
| v. | §<br>§ | AAA CASE NO. 01-18-0000-1296 |
| ROCKHILL CONSULTING GROUP, LLC<br>Respondent and counterclaim claimant | §<br>§<br>§ | |
| RIVO HOLDINGS, LLC<br>Respondent | §<br>§<br>§ | |
| DANIEL KOETTING<br>Respondent | §<br>§<br>§ | |
| VERACITY, LLC<br>Respondent | §<br>§ | |

1

**EXHIBIT 6-1**

**CLEAR LOAN SOLUTION'S AMENDED COUNTERCLAIMS AGAINST REDONDO MANAGEMENT, LLC, PRAIRIE GATE I, LLC, MAINSPRING MANAGEMENT, LLC AND MARK KOETTING**

Clear Loan Solutions, LLC expressly reserves all rights to make additional filings with the consent of the Arbitrator and/or pursuant to AAA rules, including but not limited to amended claims, dispositive motions, and motions to add additional parties.

## I.    BACKGROUND

### A.    The Service Agreement

1.      Clear Loan Solutions, LLC is a wholly-owned entity of the Big Lagoon Rancheria, a federally recognized Indian tribe and sovereign nation with tribal headquarters located in Arcata, California.

2.      Clear Loan Solutions, LLC is a tribally-owned lending entity (hereinafter, the "TLE") that markets and originates small-dollar short-term loans to customers who choose to do business within the Tribe's jurisdiction by entering into consensual contracts via the internet.

3.      On August 30, 2013, the TLE and Redondo Management, LLC ("Redondo") entered into an Amended and Restated Consultant and Independent Contractor Agreement ("Service Agreement") (attached hereto as **Exhibit A**).

4.      Redondo is a Delaware limited liability company owned by Mark Koetting. Mark Koetting is a party to the Service Agreement in his personal capacity. (Redondo and Mark Koetting are hereinafter collectively referred to as the "Service Provider").

5.      Through the Service Agreement, the Service Provider became an independent contractor who contracted to "manage, advise and assist" the TLE in the day to day operations of the TLE's lending businesses. (*See* Ex. A, p. 1).

6.      The Service Agreement laid out specific duties to be performed by the Service Provider. (*See id.* at ¶ 3). These duties involved, among other things, identifying and contracting with vendors, banks, payment processors and other third parties on behalf of the TLE. The Service Provider was to administer and service new and existing customer loans on the TLE's behalf.

7.      As part of this function, the Service Provider, acting on behalf of the TLE, oversaw loan applications, loan underwriting, loan payment processing, and collection of defaulted loans.  The Service Provider was also required to maintain data storage and the security and confidentiality of data systems, personal financial information, and transaction data that is essential to the marketing, origination, servicing and collection of consumer loans.

8.      At all times, the TLE bore the costs of customer acquisition for its customer loan portfolio. The Service Provider was to be compensated in accordance with the terms of Service Agreement.

2

**EXHIBIT 6-2**

9.      The TLE believes the Service Provider has absconded with accounts receivables, vendor agreements, and intellectual property that belongs to the TLE, as well as a small amount of physical property related to the loan operations.

10.      The Service Provider has refused to turn over TLE property. In doing so, the Service Provider has breached the Service Agreement and violated Tribal, state, and federal laws related to consumer lending and the confidentiality of personal financial information.

11.      This arbitration is brought pursuant to Paragraph 8(a)(ii) of the Service Agreement. (*See id.* at ¶ 8).

**B.      Tribal Consumer Lending**

12.      Consumer lending is a highly-regulated industry under tribal, state, and federal laws. The Service Agreement was designed to not only allocate commercial responsibilities between the parties, but also to ensure that the relationships are lawful, that they comply with consumer financial protection law, and that the Service Provider takes no action that would abrogate the TLE's sovereign immunity—without which the TLE might be subject to state licensing and usury laws.

13.      For the TLE's and the Service Provider's businesses to be lawful, the TLE and Service Provider must operate in a way that makes each TLE the "true" lender and an "arm of the tribe," which generally involves the TLE having substantial control over the operations. Otherwise, the Service Provider, which is not licensed to offer consumer loans within any state, would violate the laws of every state in which borrowers reside. *See, e.g.*, *People ex rel. Jan Lynn Owen v. Miami Nation Enterprises* (2016) 2 Cal.5th 222, 244-55 (holding that an entity separate from the tribe is not entitled to immunity from state lending regulations unless the entity can provide evidence meeting a five factor test weighing in favor of extending immunity).

14.      The TLE sought to ensure its business would survive scrutiny under the *Miami Nation* test by exercising greater control over the lending enterprise and demanding greater transparency from the Service Provider.  The Service Provider, however, refused to cooperate by (1) refusing to provide detailed financial records and audits to provide transparency; (2) refusing to produce copies of contracts signed on behalf of the TLE; and (3) refusing to identify the names of the TLE's payment processors, banks, or loan management software provider(s).

15.      When the Service Provider cut the TLE off from its business operations, it breached the Service Agreements and engaged in illegal conduct.

16.      In 2017, the Service Provider failed to submit license renewal forms to the Tribal Regulatory Authority, and its license was not renewed. Despite not having a license, the Service Provider continue to market and accept payments for the TLE's consumer loans.

**C.      The Service Provider engaged in theft, fraud, and misuse of consumer data**

*1.      Diversion of customers*

3

**EXHIBIT 6-3**

17.    The Service Provider used its access to TLE consumer information to redirect customers to other lenders controlled by and/or affiliated with the Service Provider.

18.    According to Heather Smith, the former director of compliance and human resources for the Service Provider, Mark Koetting decided in May or June of 2017 to cut out the TLE and move customers from the TLE to a new entity.

19.    Without telling the TLE, Mark Koetting moved quickly to redirect the TLE's customers. He took out new URLs in early July 2017. According to Ms. Smith, Mark Koetting's new operation was up and running in the third quarter of 2017. This coincided with the drop in customer volume noticed by the TLE in the fall of 2017.

20.    Ms. Smith reported that Mark Koetting used the Service Provider's "VIP agents" to forward the TLE's customers to his new operation. This scheme worked as follows: the VIP agent, an employee of the Service Provider, would call an existing TLE customer. The VIP agent would offer to forgive the customer's loan with the TLE if the customer took out a new loan with a new lender affiliated with and/or controlled by Mark Koetting. Mark Koetting used the TLE's database to obtain the consumer information used to market to the TLE's customers on behalf of this new lending operation.

21.    The Service Provider hid this scheme by refusing to give the TLE access to the TLE's database. Once the TLE received limited access on May 11, 2018, the database records confirmed that the Service Provider had been funneling the TLE's customers to a new lender via the scheme described above. Once the Service Provider had finished its diversion of customers to the new lender, the Service Provider purportedly "resigned" as Executive Director of the TLE. The TLE believes Mark Koetting is now operating Redondo or a successor-in-interest to Redondo under the name Mainspring Management, LLC ("Mainspring"), including the use of TLE data and former Redondo employees. Mainspring is an alter ego of Redondo and Mark Koetting.

*2.    Self-dealing line of credit*

22.    Mark Koetting, through Redondo, caused the TLE to enter a line of credit agreement with Prairie Gate I, LLC ("Prairie Gate"). On information and belief, Mark Koetting owns and/or controls Prairie Gate and Prairie Gate is an alter ego of Mark Koetting. The line of credit was capped at $100,000.

23.    The line of credit was, in reality, a way to funnel more money from the TLE to Mark Koetting and his alter ego entities. From January 2018 through April 2018 alone, the TLE paid almost $448,000 to Prairie Gate.

24.    CLS bank records show approximately $2.8 million transferred from Prairie Gate to the TLE from 2013 to the present. Those records also show payments from the TLE to Prairie Gate totaling over $10.8 million. That amount is far in excess of the maximum amount of the line of credit, even with accrued interest.

4

**EXHIBIT 6-4**

### 3. *Unearned payments*

25.    The Service Provider has not been entitled to payment from the TLE since at least January 8, 2018, to the present. Records show that, in that time, the Service Provider nonetheless paid itself over $800,000 in TLE funds. The Service Provider also failed to make payments to the TLE itself during that time.

### 4. *Other acts of theft and deception*

26.    The Service Provider represented to third parties that it was acting on behalf of the TLE when, in reality, the Service Provider was acting in its own self-interest. For example, the Service Provider instructed the TLE's software vendor, Infinity, to refuse the TLE access to the TLE's information. The Service Provider did so in an effort to conceal its fraud, theft, and misappropriation of customers and data.

27.    The Service Provider caused TLE funds to be used for non-business purposes, including a youth football payments and numerous cash withdrawals from ATMs while the accounts were controlled by the Service Provider.

28.    The Service Provider used the TLE's bank account to automatically cover overdrafts in the Service Provider's bank account. The Service Provider did so by establishing linked bank accounts at Bank of America for Redondo, the TLE, and another company owned by Mark Koetting (BB Processing). Between November 2016 and March 2018, the Service Provider misappropriated over $257,000 in TLE funds to cover overdrafts in the Redondo bank account.

## II. ISSUES FOR ARBITRATION

### A. <u>Breach of Fiduciary Duties</u>

29.    On information and belief, the Service Provider diverted the TLE's customers to other lenders with whom the Service Provider had agreements.

30.    The Service Agreement granted the Service Provider specific authorities and responsibilities, including the following:

    a.  3(a): to "be primarily responsible for the supervision, management, and oversight of Tribe's Consumer Lending Program, the performance of its contractual obligations, contacts with Third Party Service Providers, and the Bank;"

    b.  3(b): "for identifying, negotiating, and contracting with vendors and other necessary Third Party Service Providers;"

    c.  3(b): "to sign agreements with Third Party Service Providers to bind [the TLE];" and

5

**EXHIBIT 6-5**

d. 3(h): to "be solely responsible for managing and accessing bank accounts related to this Agreement." (*See* Ex. A, B).

31. As a result, the parties entered into a principal-agent relationship and the Service Provider thereby assumed fiduciary duties to the TLE.  The Service Provider's fiduciary duties required them to act in the best interests of the TLE, as opposed to the self-interest of the Service Provider. Both Redondo and Mark Koetting personally owed fiduciary duties to the TLE under Delaware law.

32. The Service Provider's conduct violates Delaware law regarding a fiduciary's duty to act on behalf of the principle. (*See* Ex. A at ¶ 13.f.) Under Delaware law, a fiduciary "has the duty to act primarily for the benefit of another in matter connected with the undertaking." *J. Leo Johnson, Inc. v. Carmer*, 156 A.2d 499, 503 (Del. 1959).

33. Beginning in the fall of 2017, the TLE noticed a drop in the number of consumers originating loans.  At the time, the TLE had not directed the Service Provider to decrease the portfolio size or stop marketing to new customers.

34. Accordingly, the TLE believes that beginning in or around the fall of 2017, if not earlier, the Service Provider began transferring TLE customer information and leads to other lenders.  This is a deceptive practice.

35. The Service Provider's deceptive practice has been confirmed by Heather Smith and the loan management database records, which demonstrate that the Service Provider has diverted TLE customers to a new lender that is affiliated with and/or controlled by the Service Provider and/or Mainspring.

36. It appears that, in some instances, the Service Provider may have substituted itself as the "client" in vendor relationships without the permission of the TLE in an effort to enable the Service Provider to more easily divert customers and money from the TLE.

37. The Service Provider has intentionally engaged in numerous other acts that were detrimental to the interests of the TLE and benefitted the Service Provider at the TLE's expense.

### B.    Fraud

38. The Service Provider, directly and indirectly, made numerous material misstatements and omissions, including (1) stating that the TLE was not entitled to access the database in an effort to conceal customer diversion, and (2) failing to disclose to the TLE that the Service Provider was engaging in theft and customer diversion while under a duty to disclose.

39. The Service Provider knew its representations were false.

40. The TLE reasonably relied on the Service Provider's misrepresentations and was damaged thereby.

6

**EXHIBIT 6-6**

41.    Other parties relied on the Service Provider's misrepresentations to the TLE's detriment.

**C.    Conversion/theft**

42.    The Service Provider, Mainspring, and Prairie Gate wrongfully took money and data from the TLE. The Service Provider, Mainspring, and Prairie Gate were not entitled to the money or data they took from the TLE.

43.    The TLE has a right to possession of its money and data.

44.    The Service Provider, Mainspring, and Prairie Gate converted the funds and data taken from the TLE.

**D.    <u>Violation of the Gramm-Leach-Bliley Act</u>**

45.    The Gramm-Leach-Bliley Act ("GLBA"), 15 U.S.C. §§6801-6809; §§6821-6827, protects consumers from misuse of personal financial and identifying information ("PII") and is implemented by the Privacy Safeguards Rule at 16 C.F.R. Part 313. PII includes personally identifiable financial information and any list, description, or other grouping of consumers (and publicly available information pertaining to them) that is derived using any personally identifiable financial information that is not publicly available. (16 C.F.R. 313.13(n)(1)). The Privacy Safeguards Rule says that, "An individual who is a consumer of another financial institution is not your consumer solely because you act as agent for, or provide processing or other services to, that financial institution." (16 C.F.R. 313.13(e)(2)(v)).

46.    The Service Provider used data and PII acquired by acting as agent of, or providing processing or other services to the TLE to create what it brands as a "consumer marketing database," which the Service Provider claims to own.  The Service Provider violated the GLBA by claiming ownership of PII that consumers did not give to it.

47.    Consumers who provide their personal financial information to the TLE are told that their information is provided to the TLE, not to an anonymous service provider.

48.    The websites and loan agreements do not identify the Service Provider and do not disclose to consumers that the Service Provider will be keeping, using, or redistributing the consumers' personal financial information.

49.    Under the GLBA, nonpublic personal information can be shared with nonaffiliated companies in two circumstances: (1) for everyday business purposes, or (2) if the individual is first given a right to opt-out of the sharing and does not do so or if the consumer consents to the sharing. 15 U.S.C. § 6802(b).

50.    It violates the GLBA's privacy provisions for financial institutions to share outside of these circumstances. In retaining private consumer data it acquired on behalf of the TLE, the Service Provider violated the GLBA.

**EXHIBIT 6-7**

51.    GLBA Section 502(d) provides that a "financial institution shall not disclose, other than to a consumer reporting agency, an account number or similar form of access number or access code for a credit card account, deposit account, or transaction account of a consumer to any nonaffiliated third party for use in telemarketing, direct mail marketing, or other marketing through electronic mail to the consumer." 15 U.S.C. § 6802(d).

52.    The Federal Trade Commission has explained that this statutory prohibition requires the financial institution that acquired the account information (here, the TLE) to retain control of its customers' account numbers. It provides, "one of the limited exceptions to the prohibition against disclosing transaction account numbers permits a financial institution to disclose a customer's transaction account number to its third party agent or service provider solely to market the institution's own products or services…."[1]

53.    This exception would only allow the Service Provider to use a customer's transaction account number to market the TLE's products and does not allow the Service Provider to use such information to market the products or services of any other financial institution or Tribal lending entity. Thus, the Service Provider's use of private customer data in any marketing database for the Service Provider's exclusive benefit also violates the GLBA.

**E.    <u>Breach of Contract</u>**

54.    The TLE submitted a Notice of Default to Redondo on January 8, 2018, notifying the Service Provider it was in material breach of a number of the Service Agreement's provisions.

55.    Despite the Service Provider's default, the Service Provider continues to compensate itself under the Service Agreement and has not transferred any revenues from the lending operations to the TLE.

56.    In addition, the Service Provider has cut off the TLE's access to bank accounts and vendor relationships in violation of the Service Agreement.

57.    The Service Provider has violated the following provisions of the Service Agreement as a direct result of its theft of the TLE's customers and property as well as with its unauthorized and misleading communications with the TLE's customers and vendors:

   a.    ¶ 6 ("Contractor shall be able to cause itself to be paid for so long as no properly noticed Event of Default exists.")

   b.    ¶ 4.b.iii (the performance of this Agreement by Contractor does not violate applicable laws);

   c.    ¶ 3.a (Service Provider will report directly to the [TLE] Board of Directors);

---

[1] Joint Interpretive Letter # 910, June 2001. https://www.ftc.gov/system/files/documents/rules/privacy-consumer-financial-information-financial-privacy-rule/313.12_guidance_account_number.pdf

8

**EXHIBIT 6-8**

d. ¶ 3.c ("Contractor shall take reasonable measures to ensure compliance with [the TLE's] day-to-day activities as required by all applicable Law);

e. ¶ 3.c ("Contractor shall also consult with the Board of Directors and the Regulatory Authority regarding development and implementation of controlling regulations and a comprehensive audit and/or compliance management program to safeguard the operation of the Tribe's Consumer Lending Program.");

f. ¶ 3.d ("Contractor shall be responsible for preparing monthly, quarterly, and annual financial statements for the [TLE] Board of Directors.")

g. ¶ 3.h ("[the TLE] shall have access to [bank accounts to] monitor the current status of the loan portfolio…")

h. ¶ 7.a ("Contractor and [the TLE] mutually agree … for a term of three (3) years after the term of this Agreement, not to reveal confidential information or trade secrets to any person, firm, corporation or entity.")

i. ¶ 7.b ("**Contractor and [the TLE] shall treat in confidence the provisions of this Agreement and all documents, materials, and other information related to this Agreement including, but not limited to, all proprietary information, data, trade secrets, business information and other information of any kind whatsoever** which (a) a Party ("Discloser") discloses, in writing to the other Party ("Recipient") or to which Recipient obtains access in connection with the negotiation and performance of this Agreement or a related agreement, and which (b) relates to (i) the Discloser, (ii) **[the TLE] and its customers or affiliates, or (iii) consumers who have made confidential or proprietary information available to [the TLE]** or a Third-Party Service Provider, that were obtained during the course of …the performance of, this Agreement (collectively "Confidential Information")" (Emphasis added)

58.    Discovery is ongoing and the TLE reserves the right to amend this list to add additional contractual violations.

## F.    <u>Violation of Tribal Law</u>

59.    Based on the above, the Service Provider has beached multiple provisions of the Big Lagoon Rancheria Tribal Consumer Financial Services Regulatory Code, including, without limitation, the following:

a. Section 6.1, <u>Compliance</u>. ("Licensees shall at all times comply with the provisions of this Code, rules and regulations promulgated pursuant to this Code, and all other applicable Tribal, and federal laws as applicable.")

b. Section 6.2, <u>Federal Consumer Protection Laws</u>. A Licensee shall conduct business in a manner consistent with principles of federal consumer protection law, including, without limitation, the following, as applicable: ….; privacy

9

<strong>EXHIBIT 6-9</strong>

provisions of Title V of the Gramm-Leach-Bliley Act, 15 U.S.C. §§ 6801 et seq., and related regulations at 16 C.F.R. Part 313 and 16 C.F.R. Part 314;….")

c. Section 6.5, Books Accounts, and Records, Examination Costs. ("A Licensee shall maintain at each location at which it conducts business all books, accounts and records that the Authority reasonably requires. Each Licensee shall: (1) Ensure that the books, accounts and records are sufficiently detailed to comply with the Code and all applicable Tribal and federal laws; and (2) Maintain the books, accounts and records separately from any other business in which the Licensee is engaged and shall retain the books, accounts and records for at least three (3) years.")

d. Section 6.6, Annual Reports. ("Every Licensee shall file a confidential annual report with the Authority in a time and manner specified by the Authority. Each report shall contain information specified by the Authority sufficient for the Authority to determine compliance with this Code including, at a minimum, the following: (1) the name, address and telephone number of the Licensee; (2) the names, addresses and titles of the principal employee of the Licensee; (3) a sworn statement that the Licensee, to the best of its knowledge, has complied and will continue to comply with all Tribal and federal laws applicable to consumer financial services; and (4) the name and address of the registered agent who will accept service of process from the Authority on behalf of the Licensee.")

e. Section 6.7, Audit Requirements. ("Each Financial Services Licensee, or Vendor Licensee upon request, with the exception of those Vendor Licensees who solely provide funds to a Financial Services Licensee for the operation of the business, shall provide to the Authority annually a copy of an independent audit designed to reflect compliance with applicable law, including such information and in a format required by the Authority.")

60. Discovery is ongoing and the TLE reserves the right to amend this list to add additional violations.

## G. Alter Ego

61. Mark Koetting operated Redondo and Prairie Gate as alter egos of himself. In addition to the facts above, the State of Delaware cancelled the corporate existence of Redondo and Prairie Gate in 2015 for failure to designate a corporate agent, and those LLCs have not been reinstated.

62. It appears that Mark Koetting has continued to operate the business of Redondo as a new entity, Mainspring Management, LLC.

10

**EXHIBIT 6-10**

63.     Because Redondo, Mainspring, and Prairie Gate were alter egos of Mark Koetting, and because the corporate form was used to commit fraud and injustice, the corporate form and limited liability of Redondo, Mainspring, and Prairie Gate should be ignored. Redondo, Mainspring, Prairie Gate, and Mark Koetting should be treated as one and the same, and should be jointly and severally liable for any money damages in this arbitration.

### III. RELIEF REQUESTED

WHEREFORE, Clear Loan Solutions, LLC, requests the following relief in an order that is enforceable in a federal court or in a proceeding for garnishment, attachment, or levy:

1) Immediate access to all TLE documents and other property withheld by the Service Provider;

2) An order permanently prohibiting the Service Provider from using any derivative of the TLE's name in business dealings;

3) An order requiring the Service Provider to terminate all unauthorized and misleading communications with the TLE's customers;

4) Identification as to where the TLE's borrowers have been diverted;

5) An order finding that consumer information and PII provided to the TLE is the property of the TLE and not the Service Provider or any other entity;

6) An order finding that the TLE is the sole owner of the databases and requiring the Service Provider to turn over full and sole control of TLE databases and vendor relationships to the TLE;

7) Monetary compensation in an amount to be determined for lost loan profits and fees, including compensation for the drop in origination volume, and loss of anticipated growth in the portfolio;

8) Attorney fees the TLE has been forced to expend to resolve this issue;

9)  An order requiring the Service Provider to indemnify and defend the TLE, its principals, officers, directors, and owner against any proceeding brought against it that in any way relates to TLE activities conducted or authorized by Service Providers, including any investigation, subpoena, indictment, or lawsuit—whether private or by any governmental entity—and to pay any and all amounts— including fines and penalties—determined, ordered, adjudged, or decreed, or as agreed to in a settlement or consent order in which the TLE is a party;

10) An order that Service Provider set aside a legal defense fund of two-million dollars ($ 2,000,000) from which the TLE will have the sole discretion to

**EXHIBIT 6-11**

dispense to consumers or other parties to settle any claims related to the violation of any Tribal or federal consumer financial protection statute or regulation;

11) An order piercing the corporate veils of Redondo, Mainspring, Prairie Gate and holding all alter ego entities jointly and severally liable for indemnification and the misconduct alleged herein;

12) An order attaching the personal residences and chattel of Mark Koetting until satisfaction of any orders for redress has occurred;

13) An order requiring the Service Provider to transfer to the TLE the domain names, email addresses, telephone numbers, fax numbers and trademarks associated with the TLE's business; and

14) Any other relief as to which Clear Loan Solutions, LLC is entitled.

Respectfully submitted,

ROBINS KAPLAN LLP

_/s/ Brendan V. Johnson_____
Brendan V. Johnson
BJohnson@RobinsKaplan.com
140 North Phillips Ave.
Suite 307
Sioux Falls, SD 57104
Telephone: (605) 335 - 1300
Fax: (605) 740 - 7199

**ATTORNEYS FOR CLEAR LOAN SOLUTIONS, LLC**

12

**EXHIBIT 6-12**

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was delivered to all counsel of record via electronic mail message on this 1st day of June, 2018.

BRADLEY ARANT BOULT CUMMINGS, LLP
S. David Smith
sdsmitb@bradley.com
Melissa Gutierrez
mgutierrez@bradley.com
600 Travis Street, Suite 4800
Houston, Texas 77002
(713) 576-0300 Telephone
(713) 576-0301 Telecopier

JENNIFER GALLOWAY, PA
Jennifer Galloway
jennifer@gallowaypa.com
711 South Howard Ave. Suite 200
Tampa, FL 33606
(813) 401-6161 Telephone
(813) 902-6456 Fax

**ATTORNEYS FOR REDONDO MANAGEMENT, LLC AND MARK KOETTING**

**For AAA: Rebecca Nako, Director of ADR Services, RebecaNako@adr.org**

/s/ Brendan V. Johnson_____

89018399.2

13

**EXHIBIT 6-13**