**EXHIBIT 8**

**David Smith**
sdsmith@bradley.com
713-576-0307 direct





March 5, 2018

## CONFIDENTIAL MEDIATION MEMORANDUM

Mr. Tom F. Gede – tom.gede@morganlewis.com
Morgan Lewis
One Market
Spear Street Tower
San Francisco, CA 94105

> RE:  *Rockhill Consulting Group, LLC v. Green Gate Services*, AAA Case No. 01-18-0000-1296, in the American Arbitration Association

Dear Mr. Gede:

This correspondence is being forwarded to you on behalf of Rockhill Consulting Group, LLC ("Rockhill") regarding the upcoming mediation of the above-referenced arbitration (the "Arbitration"), scheduled to begin at 9:00 a.m. on March 22, 2018 at the San Francisco, California office of Morgan Lewis.[1]

### I.    Parties Attending Mediation

The following parties will be present for the mediation:

| Parties | Attorney(s) and/or Representative(s) |
|---|---|
| **Claimant:** Rockhill Consulting Group, LLC | S. David Smith<br>Bradley Arant Boult Cummings LLP<br>Jennifer Galloway<br>Jennifer Galloway, PA |
| **Respondent:** Green Gate Services, LLC | Brendan Johnson<br>Robins Kaplan LLP |
| **Additional parties:** Big Lagoon Rancheria | Virgil Moorhead<br>Chairman |

Rockhill is a limited liability company organized under the laws of the State of Delaware. Green Gate Services, LLC ("GGS") is a tribal lending entity formed by and wholly owned by Big Lagoon Rancheria, a federally recognized Indian tribe (the "Tribe").

---

[1] This mediation will also include another related arbitration matter, *Redondo Management, LLC v. Clear Loan Solutions*, Case No. 01-18-0000-7850, in the American Arbitration Association. Although related, Redondo and Rockhill are submitting their mediation statements separately.

**EXHIBIT 8-1**

Mr. Tom Gede
March 5, 2018
Page 2

## II.    <u>Case Summary</u>

### A.    **Background**

This dispute arises from the Tribe's desire to become involved in what is commonly known as tribal lending.  The basic model is that a tribe, as a sovereign nation under the U.S. Constitution, is entitled to sovereign immunity such that the consumer lending regulations of state law and certain federal laws generally will not apply. This circumstance is not without its limits. Generally, a tribe must comply with the "Arm of the Tribe" analysis or test in order to enjoy that immunity. Although the elements of this analysis are primarily contained in case law, there is consensus that a tribe should pass a tribal lending code, create its own tribal lending entity that is wholly owned by the tribe, that the tribe have some control over the lending entity and have a program in place to ensure compliance with the tribal code. The Tribe and GGS had no expertise in this area nor did they have an existing database of consumers that would be potential borrowers.

On August 30, 2013, Rockhill and GGS entered into a Consultant and Independent Contractor Agreement ("<u>Agreement</u>") in which Rockhill, as the Executive Director of GGS, provided services including but not limited to marketing, underwriting and loan servicing to and on behalf of GGS.

The lack of expertise in the area of tribal lending is the reason GGS and Rockhill entered into the Agreement. It is also a principle of tribal law that tribes may outsource business functions to nontribal parties off the reservation as needed if the tribe lacks the expertise and needs assistance. Pursuant to Section 2 of the Agreement, Rockhill was appointed the Executive Director of GGS to supervise, manage, and oversee the day-to-day operations of GGS because GGS had neither the expertise nor the ability to do so.[2] Under these circumstances, it was and is paramount that GGS cooperate with Rockhill and give input in order that the Arm of the Tribe test be met.

**GGS' Breaches of the Agreement**

GGS failed to comply with numerous provisions of the Agreement and despite Rockhill's multiple efforts and attempts to perform its duties as Executive Director, GGS terminated the Agreement with Rockhill. As a result of its own actions, GGS breached Sectionsn2, 3, 3(a), 3(c), 3(g), 4(a)(v), 5(a), 5(a)(ii), 5(b), 5(d) and 13(h).

### i)    <u>GGS Prevented Rockhill From Performing its Duties as Executive Director</u>

First and foremost, GGS was to appoint a Board of Directors which would provide direction and input to the Executive Director for the performance of its duties.[3] *Id.* GGS' failure, and refusal, to appoint a Board of Directors prevented the Executive Director from fully executing its duties in line with the direction of the Board of Directors.

Rockhill routinely attempted to engage in compliance and operations related calls and emails with GGS, yet GGS and its Chairman, Virgil Moorehead, refused to document or detail the results of compliance and operations related issues addressed by Rockhill, or respond to requests for input from

---

[2] *See* Exhibit A, Section 2.

[3] *Id.* at Section 3 and 3(a).

**EXHIBIT 8-2**

Mr. Tom Gede
March 5, 2018
Page 3

Rockhill about same, in violation of Section 3(c) of the Agreement. Further, without the input and direction of the Board of Directors (which was never formed), Rockhill was unable to implement its compliance audits or perform other tasks it desired. *Id.* GGS' actions in preventing compliance calls and emails is also in violation of Sections 4(a)(v), 5(b) and 5(a)(ii), which state as follows:

> GGS will use **best efforts to assist Contractor in the performance of its duties** under this Agreement, including but not limited to notification requirements and assistance with obtaining required license renewals and tribal resolutions as needed.[4]

Section 5(b) states:

> In the event . . . a Party's performance hereunder is rendered illegal or materially adversely affected, specifically including but not limited to a material decrease in the fees and/or interest that can be charged by the Tribe on the loans, by reason of changes in Law applicable to the Consumer Lending Program or to either Party, or if a Party is advised in writing by any Regulatory Authority having jurisdiction over such Party or the loans that the performance of its obligations under this Agreement is or may be unlawful, then the Party unable to perform, or whose performance has been rendered illegal or who has been so advised by a Regulatory Authority, may terminate this Agreement by giving written notice at least sixty (60) calendar days in advance of termination to the other Party, unless such changes in Law or communication from such Regulatory Authority require earlier termination, in which case termination shall be effective upon such earlier required date.[5]

Section 5(a)(ii) goes on to state:

> If either Party breaches this Agreement including, without limitation, any breach of any representation, warranty or covenant contained herein, the non-breaching Party may immediately suspend its obligations under this Agreement and/or terminate this Agreement by providing written notice thereof to the breaching Party if such breaching Party does not cure such breach within twenty (20) calendar days after receipt of the written notice of the breach.[6]

    ii)    <u>GGS Terminated its License to Access Rockhill's Intellectual Property</u>

The Agreement also granted GGS a license to use Rockhill's Intellectual Property and proprietary information; section 3(g) of the Agreement states as follows:

> During the term of this Agreement, Contractor will provide GGS a non-exclusive license to use Intellectual Property owned or licensed by Contractor as contemplated hereunder. Such Intellectual Property shall include but not be limited to websites, domain names, business names, marketing and underwriting criteria, trademarks, logos and copyrights

---

[4] *See* Exhibit A, Section 4(a)(v)(emphasis added).

[5] *Id.* at Section 5(b).

[6] *Id.* at Section 5(a)(ii).

**EXHIBIT 8-3**

Mr. Tom Gede
March 5, 2018
Page 4

(collectively "Intellectual Property"). **Contractor reserves the right to terminate all or any portion of such license at any time,** and any such license shall expire upon termination or expiration of this Agreement.[7]

As part of the license, GGS had access to Rockhill's proprietary lending software, underwriting results, preferred vendor list, consumer marketing database and the related processes and procedures for each. When GGS terminated the Agreement, its license to use Rockhill's Intellectual Property immediately ceased and GGS no longer had the right to use or access Rockhill's Intellectual Property. Notwithstanding GGS' own actions in terminating its license to access Rockhill's Intellectual Property, GGS still demands access to Rockhill's Loan Management System and other proprietary information. Further, it appears GGS has made attempts to contact Rockhill's other vendors regarding Rockhill's existing consumer marketing database.

iii)      <u>GGS Denied Rockhill's Relicensing Application With No Valid Basis for Denial</u>

The Agreement states GGS shall assist Rockhill in obtaining the requisite licenses in order to make new loans and to comply with the Tribal Consumer Financial Services Regulatory Code (the "<u>Tribal Code</u>"); section 4(a)(v) of the Agreement states as follows:

> GGS will use **best efforts to assist Contractor in the performance of its duties** under this Agreement, including but not limited to notification requirements **and assistance with obtaining required license renewals** and tribal resolutions as needed.[8]

In October 2017, and pursuant to the Tribal Code, the usual course of conduct and the Agreement, Rockhill applied for a license renewal and timely submitted the standard application form and check for the license. GGS deposited Rockhill's check but denied Rockhill's license renewal without citing the basis for the denial and without returning the funds. The Tribal Code requires an administrative hearing regarding the denial of any licensing application, yet Rockhill was denied an administrative hearing by GGS.

iv)      <u>GGS Refused to Address Rockhill's Suggested Changes to GGS' Consumer Lending Program so as to Improve the Arm of the Tribe Analysis</u>

As GGS' loan servicer, Rockhill routinely addressed necessary changes to be made to the structure of GGS' Consumer Lending Program to make it more in compliance with applicable Tribal and federal laws, as required by the Agreement. Section 13(h) of the Agreement provides as follows:

> Additionally, GGS shall act to ensure that the structure of the Consumer Lending Program remains legally defensible and aligned with the requirements of Tribal and applicable federal Indian law.[9]

---

[7] *Id.* at Section 3(g)(emphasis added).

[8] *Id.* at Section 4(a)(v).

[9] *Id.* at Section 13(h).

**EXHIBIT 8-4**

Mr. Tom Gede
March 5, 2018
Page 5

For at least three years Rockhill submitted suggested changes to GGS' operational controls and compliance changes to its Consumer Lending Program based on changes in the law, including but not limited to improving the Arm of the Tribe analysis based on recent case law. GGS acknowledged receipt of these suggestions yet never actually implemented these changes to its control functions or compliance operations, or gave instruction to Rockhill to do so. Examples of these requested changes include, but are not limited to: the installation of internet on the land, instillation of tribal employees on the tribal land and changes to operation and compliance documents and forms to better document control from GGS, all of which would improve compliance with applicable law and the arm of the tribe analysis. GGS failed to comply with this obligation prior to 2017 and in 2017 specifically refused to comply with this obligation and therefore failed to act to ensure that the structure of the Consumer Lending Program remained legally defensible resulting in substantial harm to Rockhill.

Finally, both during the pendency of the Agreement with Rockhill, and after GGS terminated the Agreement, GGS did not act in good faith and disrupted the consumer loan process and Consumer Lending Program. GGS' conduct interfered with Rockhill's ability to wind down after the Agreement was terminated by GGS, in violation of Section 5(d) of the Agreement, which requires good will upon termination.[10]

### B.      GGS Never Intended to Comply with the Agreement with Rockhill

It would appear that the Tribe and GGS intended from the outset to misappropriate Rockhill's consumer marketing database and other proprietary information under the guise of entering into the Agreement but with no intention of complying with the terms of the Agreement. Further, the facts now known to Rockhill demonstrate GGS apparently engaged in a scheme of acting so as to frustrate the structure of the Consumer Lending Program so that GGS could later claim that Rockhill was in non-compliance. As detailed above, by refusing to follow Rockhill's suggestions and efforts at compliance and operations, GGS actively worked to frustrate Rockhill's efforts to comply with the Arm of the Tribe analysis so that GGS could make a claim against Rockhill for noncompliance with Tribal and federal law.

### C.      Rockhill Has Been Damaged Due to GGS' Actions

The Agreement contains a compensation provision and associated compensation schedule. *See* Exhibit A, at Section 6 and Exhibit A to Section 6. The Agreement provides as follows:

> GGS agrees to pay to Contractor a salary and a percentage fee based on the size of the loan portfolio(s) serviced by GGS through its participation in the Consumer Lending Program.  Pursuant to Contractor's duties under Section 3(d) to prepare monthly reports and financial statements for the benefit of the GGS Board of Directors, Contractor shall identify the total loan volume serviced by GGS for the preceding month and identify GGS's Net Revenues for the preceding month.  Contractor shall be entitled to compensation based on the attached Exhibit A, to be paid on or before the tenth (10th) day of the month for the preceding month, following Contractor's

---

[10] *Id.* at Section 5(d).

**EXHIBIT 8-5**

Mr. Tom Gede
March 5, 2018
Page 6

presentation of monthly reports and financial statements.  Contractor shall be able to cause its self to be paid for so long as no properly noticed Event of Default exists.[11]

The Compensation Schedule attached as Exhibit A to Section 6 of the Agreement further provides as follows:

Any principal, interest and/or fees received on consumer loans from the Consumer Lending Program of GGS shall be paid out and distributed monthly in the following order by Contractor on behalf of and at the direction of GGS[12]:

Payments of interest and principal to the applicable creditor for each period pursuant to the terms of the applicable credit agreement between GGS and a creditor, then; GGS shall be paid a monthly minimum amount of $5,000 or $15,000 per one million dollars of gross combined active loan advances as of the last business day each month, whichever is greater then; Contractor shall be paid all expenses and salary for Contractor, with a starting annual salary of $50,000 for the full-term of the Agreement, then; all other operating expenses, fees and cost associated with GGS Consumer Lending Program shall be paid, specifically including but not limited to the Third Party Service Provider contracts, and then; any remaining sums to be paid to Contractor as a performance based fee.[13]

In accordance with the Agreement, Rockhill prepared monthly financial statements regarding the loan portfolio and the total loan volume, and submitted these monthly financial statements via email to GGS. However, Rockhill has not received its draw in accordance with the Compensation Schedule. As a result, Rockhill has been damaged in an amount greatly in excess of GGS' claim.

## III.    Discovery Status of Case

This case is in its early stages of discovery. No written discovery has been conducted. GGS has demanded access to Rockhill's proprietary information and Rockhill will produce certain documents upon the signing of a Confidentiality Agreement. However, GGS has refused to enter into the Confidentiality Agreement.

## IV.    Conclusion

GGS violated the terms of the Agreement with Rockhill and has failed to comply with the terms of the Tribal Code regarding Rockhill's license application. Rockhill desires to resolve this matter permanently by receiving its draw in accordance with the Compensation Schedule in the Agreement, as well as the appropriate licenses GGS should have had reissued to Rockhill. Rockhill is prepared to mediate this matter in good faith and looks forward to working with you towards a potential resolution of this matter.

---

[11] *See* Exhibit A, Section 6.

[12] Unless otherwise agreed to by an executed writing between the parties.

[13] *See* Exhibit A, Section 6 and associated "Exhibit A" to the Agreement entitled "Compensation Schedule."

**EXHIBIT 8-6**

Mr. Tom Gede
March 5, 2018
Page 7

Sincerely,

David Smith

SDS/snj

Enclosure(s)

**EXHIBIT 8-7**

 **Outlook**

---

**BHM-#4442639-v1-MEMO_-_Rockhill_s_Mediation_Memo**

---

**From** Smith, David <sdsmith@bradley.com>

**Date** Fri 3/2/2018 3:30 PM

**To**     Mark K <mark@redondomgmt.com>; Dan. K <dan@rivoholdings.com>

**Cc**     Jiwani, Sabrina <sjiwani@bradley.com>; Smith, David <sdsmith@bradley.com>; Jennifer Galloway <Jennifer@gallowaypa.com>

---

📎 1 attachments (687 KB)

BHM-#4442639-v1-MEMO_-_Rockhill_s_Mediation_Memo.docx;

All,

      Attached is the proposed mediation statement that is due this Monday. I have attached Rockhill's statement; Redondo's is substantially similar.

      We will send it on Monday. I plan to tell the mediator that this statement is not to go to the other side until the mediator receives the opposition's position paper. In trust, it doesn't matter since our document basically re-states our claims. However, I want to take the opportunity to remind the mediator that we still have not received confirmation of the tribe's intention to mediate on 3/22 nor has anyone responded to our query.

      In other news, the AAA has put the arbitration in motion already. It has provided 3 dates for an initial conference (3/12, 3/14, or 3/16). I confirmed my availability for all 3 dates.

      As always, I welcome your input, questions, thoughts.

      Thanks,

David

David Smith
281.536.2000

---

Confidentiality Notice: This e-mail is from a law firm and may be protected by the attorney-client or work product privileges. If you have received this message in error, please notify the sender by replying to this e-mail and then delete it from your computer.

**EXHIBIT 8-8**